## Gullett's Administrator v. Chesapeake & Ohio Railway Company, et al.

(Decided December 10, 1918.)

### Appeal from Mason Circuit Court.

1. Railroads—Personal Injuries—Contributory Negligence.—One attempting to cross a railroad track in front of an approaching train which he knew to be approaching is guilty of such contributory negligence as to prevent a recovery by him for any injury which he might sustain, or any recovery by his administrator if he should be killed.

2. Railroads—Contributory Negligence.—Decedent was traveling afoot on a public street in the suburbs of Maysville. The uncontradicted proof shows that he was running and that he ducked under the gate which was lowered across the street and ran diagonally across it so as to cross in front of the train before it blocked his passage, and that he saw the train as it approached.

Held, that he was guilty of such contributory negligence as to prevent a recovery by his administrator, although it be conceded that the railroad company was guilty of negligence in failing to signal for the crossing, as complained of in the petition.

3. Railroads—Personal Injuries—Negligence.—Evidence examined and found that it furnishes no room for the application of the sudden peril doctrine, growing out of an emergency condition in ' which one who is injured is placed because of the negligence of another.

ALLEN D. COLE and H. W. COLE for appellant.

WORTHINGTON, COCHRAN & BROWNING for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On July 12, 1916, near the noon hour, Wesley Gullett, a man 51 years of age, was killed at the western edge of Carmel street, in the eastern part of the city of Maysville, Kentucky, by a freight train colliding with him, which train was going west and was being operated over the tracks of the appellee and defendant below, the Chesapeake & Ohio Railway Company, which crossed Carmel street at that point.

The appellant and plaintiff below, the Equitable Trust Company, qualified as administrator of the deceased and brought this suit in the Mason circuit court against the Chesapeake & Ohio Railway Company and the engineer and conductor of the train, seeking to recover $50,000.00 for alleged damages to the estate of the deceased, upon the ground, as alleged, that "plaintiff's intestate, Wesley Gullett, was by the carelessness and negligence of the defendant, Chesapeake & Ohio Railway Company, and of its agents and servants, ———— Vernard and ———— Belew, who were in charge thereof, run over and instantly killed by one of defendant's freight trains going west, whereby the estate of said intestate has been damaged in the sum of $50,000.00." The petition then proceeds to allege that the individual defendants were respectively conductor and engineer of the train which collided with deceased, and then says "that said carelessness and negligence of the corporate defendant was done by and through its said servants and other of its servants then and there in its employ; and that said carelessness and negligence was the joint and concurrent carelessness and negligence of all of the defendants."

The answer traversed in its first paragraph the allegations of the petition, and in a second one pleaded contributory negligence of the deceased. That plea was denied, and upon trial the jury returned a verdict in favor of the plaintiff for $1,000.00.

Both parties filed motions and grounds for a new trial, but upon hearing the court overruled plaintiff's motion for a new trial, but sustained defendant's motion and set aside the verdict. Upon the second trial, at which practically the same testimony was introduced by both sides to the controversy, the jury, under the same instructions given upon the first one, returned a verdict in favor of defendants, and plaintiff's motion for a new trial having been overruled, it prosecutes this appeal.

The motions for a new trial filed by plaintiff after the first and second trials are practically the same, and it is therein complained that the court erred in the admission and rejection of evidence, to which plaintiff objected and excepted; that it erred in the giving and refusing instructions to the jury, and that the verdict was flagrantly against the evidence. Plaintiff took the proper steps to bring before us for consideration the transcript of the first trial, and we are asked not only to review and reverse the last judgment, but to direct the court to reenter the first one.

There are two reasons why we should not interfere with the action of the court in granting the new trial. They are (a) that trial courts have a broad discretion in the matter of granting new trials, and such discretion will not be interfered with unless plainly abused. Smith's Admr. v. Louisvillle Railway Co., 174 Ky. 784; Cherry Bros. v. Christian County, 146 Ky. 330, and Brown v. Louisville & Nashville Railroad Co., 144 Ky. 546. But if the grounds upon which a new trial was granted are insufficient, and there exist in the record no other sufficient grounds to authorize it, then this court is authorized and it would be its duty to set aside the order granting the new trial and direct a reentry of the judgment. Ross v. Kohler, 163 Ky. 583, and Perkins v. Ogilvie, 148 Ky., 309.

The grounds upon which the court granted the new trial do not appear in either of the transcripts, but we think that at least one legal ground existed, i. e., that the verdict upon that trial was flagrantly against the

evidence, which will more clearly appear later on in this opinion, since, as we have said, at the last trial the same evidence was introduced as was heard upon the first one.

Again, because (b) plaintiff insisted that the first verdict and the judgment pronounced thereon be set aside by filing its motion for that purpose, and it is clearly in no position to complain of that which it insisted upon being done.

Turning now to the merits of the case as presented upon the last trial, it is shown that Carmel street is a public thoroughfare in the eastern part of the city of Maysville, running north and south, and crossed by a double track of the Chesapeake & Ohio Railway Company running east and west. The south track is used by east bound trains, while the north track is used by west bound trains. The deceased lived on the west side of Carmel street, in the third house south from the railroad track. There were houses on the east side of Carmel street opposite to where deceased lived, and extending north up to the railroad track. The deceased worked in the western part of the city of Maysville, and traveled to and from his work on the street car, which he boarded on the north side of the railroad track, where the street railway turned west from Carmel street. It thus became necessary for him to cross the double track of the defendant in order to reach the place where he had to board the street car to go to his work. Upon the occasion in question he had just finished his dinner, had gone out of his house and crossed Carmel street diagonally in a northeasterly direction to a point in front of a store where some apples were being unloaded from a wagon at the edge of the sidewalk running on the east side of the street. According to a witness, he spoke a few words to someone present and then started north toward the place where he would have to board the street car. All the eyewitnesses, being about five in number, who saw his movements and the way he was traveling after he left the apple wagon, say that he was in a run or a fast trot; that as he approached the track he was compelled to and did "duck his head" in order to pass under the gate on the south side of the railroad track, which was then either down or measurably so; that he then discovered the approach of the train which collided with him, and which at that time was near the eastern edge of the street, and that in

order to make the crossing before the train obstructed him he turned diagonally across the street, going in a northwest direction in front of the train, which struck him about the time he was passing over the north rail of the west bound track. One of the eyewitnesses, after telling about the deceased running to the railroad track, in describing his actions as he approached it was asked and answered these questions: "Q. Did he come to the safety gate on the south side of the track? A. Yes. Q. What did he do there? A. He kindo' ducked down that way, and ran in under the pole. Q. You mean that he lowered his head and ran under the pole? A. Yes." She then explains that after passing under the pole the train was measurably upon the crossing, and the deceased took a diagonal course so as to pass in front of it.

The testimony of another witness upon this point is thus shown in the record: "Q. Did you see him when he started running down the middle of Carmel street? A. Yes, sir. Q. What did he do, and what did you say to him? A. He came down the middle of Carmel street, and I said he could not make it and the gate came down and he dodged under the gate and started down the east bound railway and turned over toward the switch box. As he stepped across the last rail of the west bound track and the train hit him and knocked him in the middle of the track with his head toward the north and his feet toward the south. Q. What did you holler to Mr. Gullett when he went by you? A. I told him he could not make it. Q. Did he hear you? A. Yes, sir. Q. Do you know whether Mr. Gullett looked at the engine or not? A. Yes, sir, he looked at it. Q. What do you say he did when he got to the gate? A. He dodged under it. Q. Was that gate down so that he had to duck under it in order to get under? A. Yes, sir. Q. And after that you say he went on the track and then turned over toward the shanty? A. Yes, sir. Q. What was he trying to do? A. He was trying to beat the train. Q. Did he ever stop running? A. No, sir, he never stopped running until the train hit him."

This witness was at the southeast corner of the crossing and was close by where he could both see and hear what occurred.

Another witness, who was on the porch of the store located just off the street at that corner, testified: "Q.

Did you see Mr. Gullett? A. Yes, sir. Q. What did you see him do? A. I saw him run from his house down in the street; down in Carmel street. Q. In what direction? A. Toward the railroad. Q. Did you see him when he got to the gates there on the south side of the railroad track? A. Yes, sir. Q. What did he do when he got to them? A. He ducked his head and went under the pole. Q. Just what did he do? A. He ran kind of quartering like to beat the train. Q. In which direction? Down that way. (Witness illustrates by gesture.) Q. Toward what? A. Toward Mr. Wood's shop. Q. Where is that shanty of Mr. Wood's? A. On the corner of Carmel street. Q. On which side of the railroad track? A. The west side. Q. Is it on the hill or river side? A. The river side. Q. Did he ever stop running? A. No, sir. . . . Q. Then he passed you before he got to Walter Willison? A. Yes, sir. Q. Did you hear Walter holler anything to Mr. Gullett? A. Yes, sir. Q. What did he say? A. He said: 'Mr. Gullett, you can not make it.' Q. Did Mr. Gullett stop? A. No, sir; he kept on running. Q. Did he look at Walter? A. He just looked at him and went on.''

Still another witness was asked and answered: ''Q. What, if anything, did you see Mr. Gullett do? A. When I saw Mr. Gullett he came running down. Q. From where? A. His home; when I saw him he was right on the crossing. He was talking to his wife as I went up and the train came and he came running and ducked his head down and went across. He didn't make it straight across, but went quartering across this way.''

The fireman who was on the side of the engine from which deceased approached said that he saw him coming toward the front of the engine after it had gotten upon the street or near thereto, and that he thought the danger so apparent that no effort would be made by deceased to cross in front of the train, but that after passing the crossing and observing some dust which was produced by the collision he inquired of the engineer if any one had passed over on that side, and being informed that they had not, the train was then stopped and it was discovered that the deceased was killed. Just before the west bound train approached the crossing an east bound freight train had gone up on the south track. Just how far the caboose of that train had passed east beyond the crossing is in considerable doubt from the testimony, al-

though some of plaintiff's witnesses say that it had passed out of sight at a point perhaps 100 yards east of the crossing. These witnesses lived in houses on the east side of Carmel street and south of the crossing, and saw the west bound train from the windows of the rear rooms of their residences. They stated that their view of the west bound train was unobstructed by the east bound one. As is usual in such cases, there was some contradiction in the testimony as to the exact location not only of the east bound train at the time of the accident, though admittedly past the crossing, but also upon the points as to whether the gates on the south side were entirely down and whether the west bound train gave the proper or any signals for the approach of Carmel street. But there is practically no contradiction as to what occurred at the time of and immediately preceding the accident. This is shown by the testimony of the only eyewitnesses, being the ones to which we have referred. From their testimony it is extremely doubtful, to say the least of it, if the defendant's motion for a peremptory instruction should not have been given. The evidence referred to leaves no doubt in the mind but that deceased knew of the approach of the long freight train, and endeavored to make the crossing before its passage was blocked by it so as to catch the first street car that would take him to his work, it appearing that the street cars at that point ran irregularly and at more or less long intervals. However, since to uphold the judgment it is not necessary for us to pass upon this feature of the case, we decline to do so. What has been said is sufficient to dispose of the objection that the verdict was contrary to the evidence or was flagrantly against it.

We do not find in the record any testimony offered by the defendants wrongfully admitted, nor do we find any wrongfully rejected which was offered by the plaintiff. In fact, very few objections to the admission or rejection of evidence by either side appear in the record, and no error arising under this head is discussed in brief of appellant's counsel.

This leaves for consideration only the instructions of the court complained of. It would render this opinion too long to copy the offered and given instructions, since they are numerous. But we have examined them and have found that those given correctly submitted all phases of the case presented by both the pleadings and

the evidence. The several criticisms of the instructions include one that the court failed to recognize in any of them that rule in negligence law known as "the sudden peril doctrine," since it is claimed that the facts of this case authorized the application of that doctrine, and if this be true there can be no doubt but that the court should have appropriately submitted it to the jury. The basis of this contention is that deceased, by the negligence of defendants, was placed in peril requiring him to act in emergency, because the west bound train did not signal for the crossing; because there were obstructions consisting of limbs of trees and shrubbery at the southeast corner of the crossing, which obstructions were located in a yard extending up to between ten and twelve feet of the railroad track (but not on the right of way) and because the gate on the south side of the track was, according to some of the evidence, out of repair and might not have been entirely down. But, conceding all of these contentions to be true, which to do so would ignore the preponderance of the evidence, it is uncontradicted that one can see for a long distance an approaching train from the east when within at least eight feet of the south track, which is a distance of practically twenty feet from the track upon which deceased was killed, and it is shown by the two witnesses at the south east corner of the crossing, as we have seen, that deceased not only looked in the direction of the train, but was admonished that he did not have time to cross in front of it, which admonition he heard and did not heed, but attempted to pass ahead of the train by going down the track and in the direction it was traveling. From this testimony we find no room for the application of the sudden peril doctrine, and are compelled to hold that this criticism of the trial is not well taken.

The testimony of eyewitnesses, to some of which we have just referred, brings this case, as we conclude, directly within the rule recognized in the cases of C. & O. Ry. Co. v. Warnock's Admr., 150 Ky. 74; L. & N. R. R. Co. v. Taylor's Admr., 69 Ky. 435; Same v. Fentress's Admr., 166 Ky. 477; Same v. Trower's Admr., 131 Ky. 589, and Stull's Admr. v. Kentucky T. & T. Co. 172 Ky. 650, in which it is in substance held that one attempting to cross a railroad track in front of an approaching train—which he knew to be approaching—is guilty of

such contributory negligence as to prevent a recovery by him for any injury which he might sustain, or any recovery by his administrator if he should be killed. Indeed the complained of instruction on contributory negligence is copied from the Warnock case. It is criticised, however, because it is claimed that the evidence here shows the gate to have been out of repair and improperly adjusted, and does not disclose that the deceased saw the approaching train, and that he was in no position to see it until he got to the track upon which it was running, and that he was then, through the negligence of defendants, placed in an emergency from which in extricating himself he could not be charged with contributory negligence if he chose the wrong course. These criticisms are based upon an entirely incorrect interpretation of the testimony.

Another criticism is one directed to the instruction concerning the maintenance and operation of the gates across Carmel street. It is doubtful if this instruction should have been given at all, since in an early part of this opinion it will appear that the negligence relied upon consisted of the wrongful operation of the train, and no rule is more firmly fixed in this jurisdiction than the one that only specified negligence may be relied upon in the absence of a general charge of negligence. But, giving the allegation charging negligence the most favorable construction for plaintiff by conceding it to be broad enough to include negligence with reference to the gate, we then find that the court told the jury "that it was the duty of the defendant company to exercise ordinary care to maintain and operate the safety gates at the said Carmel street crossing so as to give reasonable warning to travelers of the approach of trains to said crossing," and that if the jury believed that defendant failed to perform any of the enumerated duties with reference to the gates, and deceased was killed as a result thereof, that the verdict should be for the plaintiff. It is our opinion that the court properly submitted that question, and the instruction under which it was done is not subject to the criticism which counsel make of it.

Upon the whole case we find no error prejudicial to the substantial rights of the plaintiff, and the judgment is therefore affirmed.